UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | ) |
| YOHAN A. GERMOSEN, | ) |
| Defendant. | ) |

Criminal No. 05cr10120-NG

GERTNER, D.J.

SENTENCING MEMORANDUM
January 18, 2007

Yohan A. Germosen ("Germosen") was 26 years old when he was arrested at Logan Airport.  He had no criminal record -- as a juvenile or as an adult.  He came from a close-knit family, graduated from high school, and was consistently employed throughout his adolescence and his young adult life.  Despite all obstacles, he was a credit to the communities in which he lived, and especially to the Charlestown community.  At Charlestown High School, Germosen was the target of racial attacks.  Instead of continuing the cycle of retribution and violence, Germosen worked to heal racial tensions between Latinos and White students through a program called "Words, Not Weapons."  He continued those efforts after graduation.

The events of 2005 stood in stark contrast to Germosen's prior history.  On March 10, 2005, he was arrested at Logan Airport because he had swallowed 24 pellets containing heroin. He had agreed to swallow the pills, an enormously risky endeavor, at the suggestion of a coworker.[1]  He was, in short, a "mule,"

---

[1] This was his second trip.  He confessed that he had swallowed 10
(continued...)

the lowest of the low in the drug conspiracy pecking order.  As a result, he was charged in a two-count information, alleging conspiracy to import and importation of heroin into the United States (in violation of 21 U.S.C. §§ 963, 952 and 960).

Germosen immediately cooperated with the government.  He not only confessed to what he had done, but he told officials everything he knew about the source of the drugs and the individuals to whom they were to be delivered.  He wore an electronic recording device on two occasions and recorded his conversations with a so-called "targeted individual."

The problem, a common one for drug mules, was that he did not know very much about the drug operation in which he was involved.  As a result, the government (or rather a committee in the prosecutor's office) decided not to move for a downward departure from the required sentencing range based on his "substantial assistance," § 5K1.1, noting only that it did not "rise to the level of 'substantial assistance' for purposes of a § 5K1.1 downward departure."

But for the operation of the so-called "safety valve,"[2] the quantity of drugs Germosen was carrying (256.1 grams of heroin) would have triggered a mandatory minimum sentence of five years

_____

[1](...continued)
pellets in January 2005 as well.

[2] Subsection five of the Mandatory Minimum Sentencing Reform Act, codified at 18 U.S.C. § 3553(f) is known as the "safety valve" provision.

(21 U.S.C. § 960(b)(2)(A)).  Germosen's lack of a criminal record

and his willingness to tell the authorities what he knew, among

other things, however, offered some relief.  <u>See</u> 18 U.S.C. §

3553(f)(1)-(5). The safety valve permits the Court to impose a

sentence below the mandatory minimum that would otherwise be

applicable in the case of certain low-level, non-violent, first

offenders charged with drug crimes.  In lieu of the mandatory

minimum sentence, the safety valve authorizes a sentence

"pursuant to the [G]uidelines" promulgated by the Sentencing

Commission.[3]  In addition, the Guidelines to which the statute

---

[3] 18 U.S.C. § 3553(f) provides:

> (f) Limitation on applicability of statutory minimums
> in certain cases.
>
> Notwithstanding any other provision of law, in the
> case of an offense under section 401, 404, or 406 of
> the Controlled Substances Act (21 U.S.C. 841, 844,
> 846), the court shall impose a sentence pursuant to
> guidelines promulgated by the United States Sentencing
> Commission under section 994 of title 28 without
> regard to any statutory minimum sentence, if the court
> finds at sentencing, after the Government has been
> afforded the opportunity to make a recommendation,
> that --
> (1) the defendant does not have more than 1 criminal
> history point, as determined under the sentencing
> guidelines;
> (2) the defendant did not use violence or credible
> threats of violence or possess a firearm or other
> dangerous weapon (or induce another participant to do
> so) in connection with the offense;
> (3) the offense did not result in death or serious
> bodily injury to any person;
> (4) the defendant was not an organizer, leader,
> manager, or supervisor of others in the offense, as
> determined under the sentencing guidelines and was not
> engaged in a continuing criminal enterprise, as
> defined in section 408 of the Controlled Substances
> Act; and
> (5) not later than the time of the sentencing hearing,
> the defendant has truthfully provided to the
> Government all information and evidence the defendant

(continued...)

refers are now advisory since <u>United States v. Booker</u>, 543 U.S. 220 (2005).

Safety valve or not, the sentence suggested by the Guidelines is a considerable one, particularly for someone who has never been arrested, detained, or incarcerated. The range is 37 to 46 months, with the Government recommending the low end.

Germosen moved for a downward adjustment because of his post-offense rehabilitation, and especially, his cooperation with the government. But given the facts of the case -- Germosen's law abiding life before and after the offense -- the rehabilitation claim made little sense. After reading the pleadings and the presentence report about Germosen's life and family circumstances, I noted that Germosen's offense -- operating as a "drug mule," with all of the attendant risks to his health and liberty -- seemed completely at odds with the life that he had led. I gave notice to the parties that I was considering a traditional Guideline departure, one that seemed more appropriate to Germosen's situation. I asked for briefing

---

[3](...continued)
    has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the Government is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

    The Guideline provisions mirror those of the statute. <u>See</u> U.S.S.G. § 5C1.2. In addition, the Guidelines subtract two additional points from the offense level for offenders who qualify for the safety valve.

as to whether a Guideline departure for aberrant behavior under U.S.S.G. § 5K2.20 applied.

After briefing, I concluded that the specific language of the Guideline, § 5K2.20, and the application notes, did not apply to Germosen.  In the most recent incarnation of the Guideline, after the PROTECT Act,[4] the Sentencing Commission apparently excluded "serious drug offenses" from consideration in connection with an "aberrant behavior" departure.  "Serious drug offenses" was defined so broadly that carrying drugs in one's body for piecework wages was treated the same for "aberrant behavior" purposes as carrying drugs in a briefcase for massive profits. Nothing in the Guideline text, the application notes, or the commentary, indicated why this group was excluded or even how the exclusion was related to the statutory purposes of sentencing.

True, some of the letters to the Commission by groups interested in the proposed Guideline were concerned about the abuse of aberrant behavior departures in the case of white-collar offenders.  But those concerns do not apply here.[5]  This case is not about the well-heeled banker who commits a substantial fraud,

---

[4] PROTECT Act, Pub. L. No. 108-21, 401(b)(3)-(5), (g), (i), 117 Stat. 650, 668 (2003).

[5] See Statement of U.S. Attorney James B. Comey Before the Senate Judiciary Subcommittee on Crime and Drugs, 15 Fed. Sent. R. 323 (June 2003). Comey complained that certain departures, like § 5K2.20, are "fodder in virtually every sentencing of a white-collar defendant given the community standards and background of most white-collar defendants."  Indeed, the vast majority of the comments of the Department of Justice representatives concerned white-collar defendants.  See letter of Eric Jaso, Counselor ex officio member of the Commission, 15 Fed. Sent. R. 326 (June 2003).

all the while supporting the local symphony and countless community groups.  It is not about white-collar offenders who try to buy their way out of trouble by pointing to their charitable contributions.  This case involves a man who struggled all his life, supported his community at great personal risk, and then made a mistake.  It is not about Enron.  It is about a drug mule.

I concluded that a non-Guideline sentence was appropriate in this case. Germosen's conduct was clearly aberrant, clearly inconsistent with the life he led before these offenses, and immediately thereafter.  And it was inconsistent with the life he was likely to lead in the future, as much as human beings -- and flawed judges -- can predict.  Rather than a sentence in the 37-46 months range, I sentenced Germosen to probation for two years, six months of which to be served in home detention, along with community service.

My approach was as follows:

First, "considering the Guidelines," as <u>Booker</u> requires, <u>see</u> <u>United States v. Jimenez-Beltre</u>, 440 F. 3d 514, 518 (1st Cir. 2006), meant considering both a sentence "within the applicable Guideline range *or within the permissible departure authority.*"[6] Departures have always been part and parcel of the Guidelines. <u>See</u> <u>United States v. Lacarubba</u>, 184 F. Supp. 2d 89, 93 (D. Mass. 2002).  Second, even the Guideline evaluation stage requires the

---

[6] <u>United States v. Crosby</u>, 397 F. 3d 103, 113 (2d Cir. 2005) (italics supplied).

sentencing judge to look at *all* sentencing facts, not just those made relevant by the Guidelines, if only to decide whether a departure or a variance is warranted.[7]  When I considered all the facts, an aberrant behavior departure was appropriate.

Third, considering the Guidelines, and especially, § 5K2.20, necessarily means critically evaluating them.  It cannot be enough to assume that the Guidelines perfectly embody the purposes of sentencing.  Whatever weight we give to them, even characterizing them as presumptively reasonable, as some courts have done -- notably, not the First Circuit -- will be irrelevant if courts believe that the Guidelines are, after all is considered, flawless.  Indeed, if judges conclude that the Sentencing Commission did all of the sentencing thinking for them, and that all a judge has to do is to apply the Commission's work, the Guidelines would be advisory in name only.  Critically evaluating the Guidelines, at the very least, gives a court the tools to understand when to apply a Guideline sentence, when to reject it, or when to modify it in the case at bar.

Fourth, as the Guideline sentence was inappropriate, I considered the non-Guideline sentence that was more consistent

---

[7] For example, under 18 U.S.C. § 3553(b), a judge is supposed to evaluate whether a departure from the Guidelines was warranted (as involving an "aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission").  To make that judgment, the court had to have "a perspective independent of the Guidelines," a perspective gleaned from evaluating all the facts and circumstances of the case.  See United States v. Ribot, 97 F. Supp. 2d 74, 75 n. 2 (D. Mass. 1999).

with the purposes of sentencing.  After I found that the
exclusion of Germosen from § 5K2.20 treatment was not consistent
with the purposes of punishment, I determined that, together with
home detention and community service, probation was the best
sentence by all statutory measures under 18 U.S.C. § 3553(a).

I.  **BACKGROUND**

Yohan A. Germosen was born on January 10, 1977, in the
Dominican Republic.  His parents separated when he was 3 or 4
years old.  He was raised by his mother, Cary Maldonado, and then
a maternal aunt and godmother after his mother moved to Puerto
Rico to find better employment opportunities.

In 1991, when Germosen was 14, his mother was able to obtain
a visa for him, after numerous attempts.  By that time she had
become involved with Victor Nunez, with whom she had two
children, and moved from Puerto Rico to Massachusetts.  Germosen
applied for and was granted a United States citizenship three
years later.

Germosen lived with his mother and her new family in a small
apartment in the South End.  His mother worked in the
housekeeping department of a downtown hotel.  Germosen attended
school, picked up his siblings from day care and elementary
school, and watched them until his mother came home.  Shortly
thereafter, Ms. Maldonado left Mr. Nunez when he became

physically abusive.  She married Jose Maldonado; the family moved into public housing in Charlestown, Massachusetts.

In Charlestown, defendant reported that he and his siblings were a frequent target of hate crimes and racial epithets.  He did not speak English well.  He was regularly getting into fights to protect himself and his siblings.  But then he took a different approach, one that was, by all accounts, extraordinary for an adolescent male.  He participated in a program called "Words, Not Weapons," to promote understanding of people with other cultures.  Notwithstanding his efforts, the attacks continued.  Once, after school, someone knocked on the door to his apartment.  When Germosen answered, he was hit in the face so hard that he lost consciousness and was hospitalized. Thereafter, the stress became unbearable; Germosen threatened suicide.  He began to attend night school, both to escape the violence and to make certain that he would graduate on time.

After high school, Germosen continued to work with his community to address the problems he had confronted, and the racist attitudes which had victimized him.  He became involved with Sociedad Latina, the oldest Latino organization in Boston, volunteering as a peer leader and a youth worker. Thereafter he enrolled at Bunker Hill Community College which he attended for over a year.  In 2001, he began working as a car washer in Armondo's Auto Detailing and then a sales representative at North

Shore Pontiac in Malden, Massachusetts.  In 2005, he received a real estate license.

His family circumstances improved, mainly through his mother's considerable efforts.  Now divorced from her husband, Ms. Maldonado bought a small cell phone accessory business which Germosen struggled to build.  He had five children from relationships with two women, all of whom he conscientiously supported and visited.  At the time of sentencing, he had returned to live with his mother.  By all accounts, Germosen was responsible at work and responsible to his family -- his children, his siblings, his mother.

It was the prospect of quick money to relieve some of these burdens that led Germosen to agree when a coworker at North Shore Pontiac proposed a short trip to the Dominican Republic.  It was, he concedes, a moment of weakness and shame.  He stated during his sentencing:

> I regret every second of it.  My mother
> raised us the right way, pretty much a single
> mother.  All four of us and I'm very proud of
> my mother . . . She works so hard to bring
> the family to where we are, and with one
> decision, me . . . I step on the family name.
> I feel worse than human waste.

Germosen's reaction to being apprehended was unequivocal. He confessed, and offered substantial assistance to the government in every conceivable way he could -- information, wearing "a wire," recording transactions with "targets."  He

-10-

never refused a single government request.  Unlike many offenders, cooperation with the authorities did not appear to be just another crass, expedient business calculation.  In fact, Germosen's cooperation seemed entirely consistent with his community work in Charlestown, and with Sociedad Latina.

## II.  <u>POST-OFFENSE REHABILITATION AND SUBSTANTIAL ASSISTANCE</u>

Germosen moved for a downward departure because of his post offense rehabilitation, including the extraordinary steps he took to cooperate with the government.

The government's motion for a "substantial assistance" departure under § 5K1.1 confers an enormous potential benefit on a defendant.  It not only enables the court to impose a sentence below the mandatory minimum, it confers considerably more discretion on the trial judge in determining the length of the defendant's sentence than he or she has in other situations.[8]

Inexplicably, Germosen's efforts were not enough for the government.  And that decision -- to forgo a §5K1.1 motion -- is dispositive.  Even post <u>Booker</u>,§ 5K1.1 is the realm of the prosecutor's judgment, not the court's.[9]  And, while a court's

---

[8] <u>See</u> Bruce M. Selya & John C. Massaro, *The Illustrative Role of Substantial Assistance Departures in Combating Ultra-Uniformity*, 35 B.C. L. Rev. 799, 827 (1994) (noting that "sentencing courts retain appreciably more discretion in determining the contours of a substantial assistance departure than when making departures under other guideline provisions.")  <u>See</u> <u>also</u> Linda Drazga Maxfield & John H. Kramer, *U.S. Sentencing Commission, Substantial Assistance: An Empirical Yardstick Gauging Equity in Current Federal Policy and Practice* (1998).

[9] <u>United States v. Bermudez</u>, 407 F. 3d 536 (1st Cir. 2005)(finding no error in government's refusal to file substantial assistance motion and
(continued...)

decisions must be public, detailed, on the record, and subject to appeal, the government's decision to decline § 5K1.1 status does not.  All that we know is that the government -- or a committee of the prosecutor's office -- has refused to move for a substantial assistance departure.  We are not authorized to second-guess that decision.[10]

Ironically, Germosen's argument about post offense rehabilitation is undercut by his own stellar background.  He was a law abiding citizen before this conduct; he continued to be afterwards.  Germosen's criminal conduct was an aberration in an otherwise law abiding life.  Accordingly, I turned to consider the aberrant conduct Guideline departure since it "directs the Court to evaluate [the] offense against a backdrop of the rest of

---

[9](...continued)
implicitly holding that such a motion is a prerequisite for a substantial assistance departure.)  Cf. United States v. Fernandez, 443 F. 3d 19, 33-34 (2d Cir. 2006)(suggesting that a judge may consider a defendant's cooperation in setting a sentence outside the guideline range, even without a government motion.)  In any event, the court has no power to depart below the mandatory minimum without a government motion for a departure based on substantial assistance.

[10] The Sentencing Commission acknowledged that there were "irregular and inconsistent policies and practices among the various districts" for employing substantial assistance departures.  United States Sentencing Commission, Fifteen Years of Guidelines Sentencing 103-106 (2004).  Statistics released by the Sentencing Commission in the summer of 2006, for example, showed that the United States' Attorney's Office for the District of Massachusetts had among the lowest rate of departure for substantial assistance than any other office.  See Letter of Chief Judge Mark Wolf, to U.S. House of Representatives Committee on the Judiciary Subcommittee on Crime, Terrorism, and Homeland Security, dated March 21, 2006. For example, the Northern District of New York is at 43% substantial assistance departures, while the District of Massachusetts is at 12%, according to the most recent statistics.  U.S. Sentencing Commission's Report on the Impact of United States v. Booker on Federal Sentencing (March 2006).

the defendant's life."  <u>United States v. Ribot</u>, 97 F. Supp. 2d at
85.

### III.  **ABERRANT BEHAVIOR**

#### A.    **Judicial Construction of Aberrant Behavior**

The Sentencing Reform Act, 28 U.S.C. § 994(j) directed the
Sentencing Commission to deal specifically with first offenders.
It ordered the Commission to "insure that the guidelines reflect
the general appropriateness of imposing a sentence other than
imprisonment in cases in which the defendant is a first offender
who has not been convicted of a crime of violence or an otherwise
serious offense. . ."  <u>Id.</u>

The Commission, however, implemented that statutory
directive by redefining "serious offense" in a way that was
entirely inconsistent with prior practice, and not at all based
on any real data or analysis.  First offender status was folded
into criminal history category I.  Category I included those who
had never had any encounters with the criminal justice system,
never been arrested, as well as individuals who had been arrested
and convicted but received short sentences.  Shortly after the
implementation of the Guidelines, it was clear that the
Commission's decisions led to a far higher incarceration rate for
non-violent first offenders than had been the pattern pre-
Guidelines.[11]

_____

[11] While before the Guidelines nearly 50% of federal defendants were
(continued...)

There is a demonstrable difference in the recidivism rates of real first offenders as compared to other defendants in Criminal History Category I.  <u>See</u> Michael Edmund O'Neill, *Abraham's Legacy: An Empirical Assessment of (Nearly) First-Time Offenders in the Federal System*, 42 B.C. L. Rev. 291 (2001). Minimal or no prior involvement with the criminal justice system is a powerful predictor of a reduced likelihood of recidivism. <u>See</u> *A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score*, 15 (Jan. 4, 2005), http//www.ussc.gov/publicat/RecidivismSalient FactorCom.pdf. Commission reports have concluded that first offenders are more likely to be involved in less dangerous offenses and that their offenses involve fewer indicia of culpability, such as no use of violence or weapons, no bodily injury, a minor role, or acceptance of responsibility.  They are more likely than offenders with criminal histories to have a high school education, to be employed and to have dependents.  Recidivism and the First Offender (May 2004), http://www.ussc. gov/publicat/Recidivism_First Offender.pdf.

Discontent with the Commission's approach was apparent from the beginning.  Courts took a line in the Introduction to the

---

[11](...continued)
sentenced to probation, see Bureau of Justice Statistics Sourcebook 1994, table 5.27, USSC Annual Report, table B-7 (providing rates of imprisonment from 1984-1989), afterwards it was only 15%. U.S.S.C. 1996 Sourcebook of Federal Sentencing Statistics, 20.

Guidelines to carve out a new category, judicially-defined and enforced.  In the Introduction, the Commission specifically acknowledged that it had not dealt with "single acts of aberrant behavior, which may still justify probation at higher offense levels through departures."  U.S.S.G. Ch. 1, Pt. A, intro comment 4(d).

The First Circuit defined the aberrant behavior departure as involving consideration of the "totality of the circumstances" see United States v. Grandmaison, 77 F. 3d 555, 563 (1st Cir. 1996), a definition which it adopted from the Ninth and Tenth Circuits, and which was then followed by the Second Circuit. Factors that may be considered in making this determination include "pecuniary gain to the defendant, charitable activities, prior good deeds, and efforts to mitigate the effects of the crime[.]"  Grandmaison, 77 F. 3d at 563.  "Spontaneity and thoughtlessness may also be among the factors considered, though they are not prerequisites for departure."  Id.  Such departures, the Court found, are available even though a "course of criminal conduct involves more than one criminal act[.]"  Id.  In effect, the First Circuit's focus was on situating the offense in the context of the offender's life, asking whether this offense was a "marked departure from the past and is unlikely to recur." United States v. Bradstreet, 135 F. 3d 46, 56 (1st Cir. 1998).

Other Circuits rejected the "totality of the evidence approach" and placed emphasis on the offense itself, whether it involved "a spontaneous and seemingly thoughtless act rather than one which was the result of substantial planning." United States v. Carey, 895 F. 2d 318, 325 (7th Cir. 1990).

**B.    Adoption of Safety Valve**

On a parallel track with the aberrant conduct cases was the so-called safety valve provision, which was concerned with a subset of individuals with a criminal history I score: Low level, non-violent defendants accused of drug offenses.  These individuals were being subjected to disproportionate punishment, namely, mandatory minimum sentences, precisely because they were not high enough in the criminal hierarchy to provide the government with assistance that the United States Attorney's office considered "substantial."

When enacted in 1994,[12] Congress set the general framework for the safety valve, but the Commission was to fill in the standards with its Guidelines, i.e. not more than one criminal history point *as determined by the Commission*, no violence, no death or bodily injury, defendant was not an organizer or leader *as determined by the Commission*, and the defendant must give a complete proffer.

**C.    5K2.20**

---

[12] H.R. Rep. No. 103-460, 103rd Cong., 2d Sess., 1994 WL 107571 (1994).

In 2000, the United States Sentencing Commission stepped in to address judicially defined aberrant conduct departures as well.  When it dealt with these departures, however, it <u>did</u> <u>not</u> study the relationship between the varying court definitions of aberrant behavior and the statutory purposes of sentencing, e.g. the kinds of offenders to whom the judicially created departures would apply and their recidivism rates.  It <u>did</u> <u>not</u> evaluate alternatives to incarceration for non-violent first offenders. In fact, one searches in vain for much legislative history of the aberrant behavior Guideline at all, let alone any mention of the purposes of sentencing in the application notes.

All that the Commission did in § 5K2.20 was to split the difference, combining the expansive "totality of the circumstances" approach of certain circuits with the narrow "spontaneous approach" of others, excluding certain acts and offenders but including more transactions than merely reflexive decisions.

Under § 5K2.20 "aberrant behavior" includes "a single criminal occurrence" or "a single criminal transaction," and thus, was somewhat broader than "a single act."  These departures would be limited to offenses (1) committed without significant planning; (2) of limited duration; and (3) that represent a marked deviation by the defendant from an otherwise law-abiding life.  § 5K2.20 app. n. 1.

Certain offenses were excluded from "aberrant conduct"
treatment, notably a "serious drug trafficking offense" which was
broadly defined to mean *any controlled substance offense under
Title 21 of the United States Code*, other than simple possession
under 21 U.S.C. § 844, "that because the defendant does not meet
the criteria [of the safety valve] results in the imposition of a
mandatory minimum term of imprisonment. . ."  A defendant who met
the criteria of the safety valve, the non-violent, truthful, low
level offender, could be considered for an aberrant conduct
departure.

Once it was clear that the offense was of a type covered by
the Guideline and not excluded by its terms, the court was
permitted to consider the defendant's (A) mental and emotional
conditions; (B) employment record; (C) record of prior good
works; (D) motivation for committing the offense; and (E) efforts
to mitigate the effects of the offense."  5K2.20 app. note 3.

Why did the Commission draw these particular lines -- these
particular exclusions -- and adopt these particular definitions?
The Commission never explained _why_; it only announced _what_ it had
done:

> The Commission concluded that this
> application of the current language in
> Chapter One is overly restrictive and may
> preclude departures for aberrant behavior in
> circumstances in which such a departure might
> be warranted.  For this reason, the
> Commission attempted to slightly relax the
> "single act" rule in some respects, and
> provide guidance and limitations regarding

> what can be considered aberrant behavior.  At
> the same time, the Commission also chose not
> to adopt the 'totality of circumstances'
> approach endorsed by the minority of
> circuits, concluding that the latter approach
> is overly broad and vague.  The Commission
> anticipates that this compromise amendment
> will not broadly expand departures for
> aberrant behavior.

Amendment 603, Chapter 5, Part K, subpart 2, as amended (2000).

Nevertheless, Germosen's offense, his life and his record would

have fit within the 2000 version of § 5K2.20 had it not been

amended further.

But it was amended further. In 2003, Congress passed the

PROTECT Act[13] and directed the Commission to reduce the incidence

of downward departures.  As a result, the Sentencing Commission

revised the aberrant conduct departure provision and expressly

excluded defendants who, like Germosen, were safety valve

eligible.  U.S.S.G. 5K2.20 app. n. 1.[14] This time, no reasons

were given for the change, other than Congressional pressure to

reduce departures.

**D.    <u>Application of § 5K2.20</u>**

Germosen's case clearly reflects the kinds of congressional

concerns animating 28 U.S.C. § 994(j), where the Commission was

directed to consider probation for first offenders not convicted

---

[13] PROTECT Act, Pub. L. No. 108-21, 401(b)(3)-(5), (g), (i), 117 Stat. 650, 668 (2003).

[14] "Serious drug trafficking offense" means "any controlled substance offense under title 21" other than simple possession, "that provides for a mandatory minimum term of imprisonment of five years or greater, regardless of whether the defendant meets [the safety valve criteria]."

of serious offenses.  It reflects the Congressional concerns on which the "safety valve" is based, about the unfairness of applying a mandatory minimum sentence for non-violent, first offender drug defendants.  It also reflects judges' concerns, based on the Guideline Manual's Introduction, for the real first offender, the person who literally has had no prior encounters with the criminal justice system.  And it reflects the Commission staff's concerns about true first offenders, whose rate of recidivism is low.

Notwithstanding these concerns, the 2003 Guideline definition of "serious drug transaction" in § 5K2.20 excludes the offense of which Germosen stands convicted.  It would put into the same category an offender who is so far down the organizational tree that he would endanger his life by putting drugs in his own body, for a relatively small sum of money, and one who was reaping vast profits from the same act and the same quantity.  Nowhere in the Guidelines is there <u>any</u> indication of why this exclusion makes sense, or comports with the purposes of sentencing.  In a now advisory Guideline regime, I will not assume that § 5K2.20 reflects the statutory purposes when it clearly does not.

This offense did not involve a complex transaction with much thought or deliberation.  While it was not a spontaneous act, as courts before the Guideline had required, it surely did not require significant planning.  Indeed, all the planning was

done by others far more culpable than Germosen.  The offense was
of limited duration: One trip in January and another in March.

Those trips plainly represented a marked deviation by the
defendant from an otherwise law abiding life; there was no
violence.  The defendant's record was wholly free of any criminal
offenses.  And when he was apprehended, his cooperation with the
authorities reflected just what his prior life had been like --
constructive, cooperative and law abiding.

### E.    <u>Sentence</u>

I departed from an offense level 21 to an offense level 10,
criminal history I.

I sentenced Germosen to two years of probation, including
six months in home detention.  In addition, given his community
work, I ordered Germosen to perform community service, to talk to
children about how risky this behavior was.  This sentence
reflects the policies of the sentencing reform act far better
than the exclusionary language of § 5K2.20.  It promotes respect
for the law:  Germosen will have a felony conviction on his
record.  It will affect every government or private application
he seeks, every loan he applies for, every government benefit he
tries to obtain.  It promotes deterrence:  Germosen will likely
be deterred from taking these chances again.


**SO ORDERED.**

Date:  January 18, 2007        /s/Nancy Gertner
                               NANCY GERTNER, U.S.D.C.